CARAWAY, J.
| jThe employer appeals the judgment of the workers’ compensation judge which ordered payment for employee’s knee replacement surgery, weekly indemnity benefits and penalties and attorney fees for failure to provide medical treatment and benefits. We affirm in part and reverse in part.

Facts

Kenneth Henderson began his employment with Graphic Packaging International, Inc. (“Graphic”) of West Monroe, Louisiana, in July of 1989 at the Plant 31 paper mill as an entry level laborer. In 2001, Henderson was promoted to Bobcat Operator/Laborer, a job which involved his operation of various types of machinery. On August 6, 2010, as he was operating a Bobcat to remove paper debris from underneath paper machines, Henderson climbed down the equipment to remove a hook pole (12-foot poles used to manually remove debris) from a pile of debris paper. As he grabbed the pole from the paper pile, Henderson’s right leg stepped into an 18-inch wide “u-drain.” He experienced excruciating pain as he tried to get free. Three co-workers assisted Henderson in getting out of the drain.
After the accident, Henderson reported to the infirmary where ice and a knee sleeve were applied to his knee, which had begun swelling. Henderson did not return to work but remained in a break room until his shift was over. He saw an orthopedist three days after the accident with complaints of an acute right knee injury. His right knee was swelling and buckling. From the doctor’s review and directive, Henderson did not 12immediately return to work. He later returned to work for approximately three weeks. Thereafter an *601 MRI revealed a complex extensive degenerative medial meniscus tear and severe advanced osteoarthritis of the right knee. Henderson’s physician recommended immediate knee replacement surgery and concluded that Henderson should be placed on a sedentary work restriction.
Henderson had injured his right knee while playing football in 1978 and again in 1980. In 2007, he sought medical treatment for worsening’ right knee pain and swelling. X-rays showed advanced severe degenerative arthritis. At that time, several options for treatment of the knee pain were offered to Henderson with total knee replacement being a last resort. In 2008, Henderson again sought treatment for knee pain. At that time, he indicated that his knee bothered him continually and caused pain in everyday activities. Identical findings were made regarding Henderson’s arthritic knee condition. Again, treatment options were discussed including the drawing of fluids, steroid injections and total knee replacement. Henderson chose more conservative options and was able to continue to work.
For the work-related accident, Graphic paid weekly indemnity benefits from September 2010 through June 2011. Graphic did not approve surgery and elected to send Henderson to another physician for a second opinion. On November 10, 2010, Henderson saw a second orthopedic surgeon who determined that the meniscal tear noted by the MRI was not caused by the accident, but part of the degenerative condition of RHender son’s knee. The physician concluded that “the work event of 08/06/10 resulted in a temporary exacerbation of the pre-existing severe osteoar-thritic condition of the right knee” and that the recommendation for total knee replacement was “not related to the work event of 08/06/10.”
Thereafter on March 15, 2011, Henderson underwent an independent medical examination by a third orthopedic surgeon who diagnosed “preexisting degenerative meniscal tear, probable exacerbation of preexisting condition by his most recent fall.” The physician concluded that Henderson required right total knee replacement, which was “a preexisting condition which is well documented to have been the need for surgery at least 2-3 years prior to the injury.”
Ultimately, Henderson underwent right knee replacement surgery in July of 2011 and has been unable to return to his former job. The record indicates that Henderson’s healthcare insurance provider paid for the operation.
. Henderson filed a disputed claim for compensation benefits on August 31, 2011, seeking reinstatement of indemnity benefits, past and future medical expenses, including the cost of the total knee replacement, and penalties and attorney fees for the discontinuance and for failure to pay benefits and to pay medical expenses.
At the trial, Graphic stipulated that the accident arose out of and in the course of Henderson’s employment. Henderson’s average weekly wage was stipulated at $743.20. The parties submitted the matter to the court, largely based upon the medical evidence, which included the depositions, |4records and reports of the various orthopedic surgeons who evaluated Henderson.
The sole witness to testify was Henderson who set forth the facts regarding the accident and his past knee issues as noted above. He explained that he was able to do all of his job duties without assistance until after the accident when he was not able to put any weight on his knee without it giving way. Henderson testified that at the time of his last visit to an orthopedist almost two years before the *602 accident, his knee was drained and he was given an injection. His physician explained to him that knee replacement surgery may be an option in the future; his physician also told him that knee replacement surgery would limit his ability to function. The treatment Henderson received in December of 2008 for his knee gave him relief, and he was able to continue working.
On cross-examination, Henderson conceded that his knee pain had grown progressively worse in the years before the accident and that these knee problems caused him to cut back on certain activities such as running, squatting and weightlifting three years prior to the accident. In fact, he conceded that when he operated a machine called a “scrubber,” which had two pedals for both feet, he would occasionally have fluid build-up in his knee. When that occurred, he would improvise and use only his left foot to operate the machine. Henderson insisted, however, that both of his physicians recommended knee surgery as a possibility “down the road.”
Documentation for Henderson’s June 26, 2007 evaluation by Dr. Scott McClelland of the North Louisiana Orthopedic and Sports Medicine |sClinic revealed a diagnosis of advanced degenerative arthritis, right knee. An x-ray showed “advanced arthritic changes with bone-on-bone contact in the medial compartment of the right knee, as well as advanced patellofem-oral degenerative changes.” Dr. McClel-land prescribed medication to Henderson to “see how this will help” and noted that injections would be the next option for treatment. Dr. McClelland then concluded that “if he continues to be symptomatic, arthroscopic debridement would be the next step and if all else fails then a total knee replacement.”
Henderson next saw orthopedic surgeon Dr. Sol Graves (of the same clinic) on December 15, 2008, with the same complaints of right knee pain with everyday activities. Dr. Graves “had a long discussion” with Henderson about treatment options including injections and knee replacement. Henderson opted for an injection, which Dr. Graves hoped would give him some improvement.
After the August. 8, 2010 accident, Henderson again saw Dr. Graves, reporting acute pain, swelling and discomfort in his knee. In his medical records of Henderson’s previous visits, Dr. Graves observed that Henderson was “considering a total knee arthroplasty,” but because he wanted to continue to work, he decided not to proceed with that procedure. The doctor recorded that “[sjince that time, again he does get off and on pain, but has been able to work and do his job effectively until this recent injury.” Dr. Graves concluded that the “acute flare-up is secondary to the twisting injury that occurred” and that the accident “led to increased swelling in his | fiknee and pain.” The doctor recommended aspiration and injection of the knee and anti-inflammatories and took Henderson off of work for a week. He scheduled Henderson for a follow-up visit.
An addendum note of this visit indicated that Henderson got some improvement from the aspiration and injection but continued to have pain and discomfort, and pain when walking and knee buckling. Henderson had returned to work in pain. Dr. Graves ordered an MRI of the knee.
The MRI of September 2010 showed severe osteoarthritis involving the medial compartment and complex extensive degenerative tear of the medial meniscus of the right knee. In his progress notes, Dr. Graves stated:
[Pjrobably the meniscus tear is the acute change that has occurred since his *603 injury at the beginning of August. At this point, he has gone from being able to do his regular duty work to having an extremely difficult time performing his job because of the amount of pain that he has in his knee. I do think that because of the injury that occurred in early August with the meniscal symptoms has aggravated his knee now to the point where he needs something done about it; however, I discussed with him in detail today that I do not think just scoping the knee and addressing the meniscus pathology is going to give him significant relief and I think that if he is going to have surgery, that the best treatment for his knee would be to proceed with a total knee arthroplasty.
On September 27, 2010, while awaiting approval for the knee replacement surgery, Dr. Graves took Henderson off of regular duty work and placed him on a sedentary work restriction.
In his deposition, Dr. Graves described Henderson’s arthritic knee condition as chronic. He testified that before the August 2010 visit, neither he nor Dr. McClel-land imposed any restrictions on Henderson. He stated that most people utilize other options before resorting to the invasive surgery. After the accident, however, Dr. Graves believed that Henderson |7had “something now that’s taken him from being able to work so now he can’t work because of severe pain and I think the acute thing that happened that made it change was that he had the meniscal tear.”
Nevertheless, since no MRI of Henderson’s knee was available prior to the accident, Dr. Graves was unable to say that he had a meniscus tear prior to the injury. Dr. Graves admitted that if Henderson had desired a total knee replacement in December of 2008, he would have been a candidate for one. However, Dr. Graves stated that such surgery at that time would have prevented Henderson from returning to his job at Graphic and prior to the accident, his symptoms were not severe enough to warrant immediate surgery. He explained that before the accident, his right knee degenerative changes “were about as bad as they could get as far as arthritic changes,” and it was impossible to tell when his right knee symptoms would have become bad enough for Henderson to decide to have surgery.
At the request of Graphic, Dr. Robert Holladay, orthopedic surgeon, gave a second medical opinion regarding Henderson’s condition on November 11, 2010. As noted earlier, Dr. Holladay concluded that neither the meniscus tear nor necessity of total knee replacement was related to the work injury. He also found “no objective medical evidence of an aggravation or acceleration” of Henderson’s preexisting knee condition and that “the work event ... resulted in a temporary exacerbation of the pre-existing severe os-teoarthritic condition of the right knee.” In his deposition, Dr. Holladay further explained that he did not “see any acute structural problem with the knee” that could be related to the work accident.
|8In his deposition, Dr. Brown, the independent medical examiner, testified that at the request of the Office of Workers’ Compensation, he saw Henderson on March 15, 2011. Dr. Brown described Henderson’s knee as “sort of shredded,” with “longstanding tears and there could have been some new tears.” Dr. Brown stated that his impression was as follows:
My feeling was is that he had a preexisting problem that looked like it had been going on at least three or four years, probably longer, before this accident, but according to the history in that edema in the inside of his knee, I thought there had been an injury and it looked *604 like the fall had probably aggravated this torn meniscus that he had. So my feeling was that this fellow did need a total knee. I didn’t think it was really the result of the fall. That was going to be necessary no matter what.
Dr. Brown testified that it was possible to aggravate a meniscal tear in a fall, which “twists it a little bit more and those tears just extend and become more pronounced.” He also explained that “the already damaged meniscus couldn’t really stand the blow and tears a little bit more and he becomes more symptomatic.” Specifically, Dr. Brown stated that Henderson’s need for a total knee replacement “was really already there before he fell.” Dr. Brown concluded that although Henderson’s whole knee was involved, the “worst part” was “right where the meniscus was badly torn.” He agreed that trauma would increase the symptoms of his degenerative knee condition. He also conceded that although Henderson was a candidate for knee surgery in 2007 or 2008, because he continued to do work until after the accident, the accident aggravated his knee symptoms significantly. He also testified that the meniscus tear alone would not have caused a need for total knee replacement.
IciAfter considering the evidence and testimony, the Workers’ Compensation Judge (“WCJ”) ruled in favor of Henderson, concluding as follows:
The evidence presented in this case revealed claimant had longstanding medical problems with his right knee. However, he continued to work and did not become disabled from employment until the work related accident. Commencing with the accident, disabling symptoms appeared and manifested themselves thereafter. Medical evidence indicates a causal connection between the accident and the disabling condition. Dr. Sol Graves treated claimant for his knee condition pre-and-post accident. He was asked about the aggravation of claimant’s preexisting condition. He found “He’s got something now that’s taken him from being able to work. So now, he can’t work because of severe pain and I think the acute things that happened that made it change was that he had the meniscal tear.”
Furthermore, Dr. Douglas Brown, the independent medical examiner, found the work accident resulted in a significant aggravation of claimant’s knee.
Thus, this Court finds claimant’s work injury, aggravated, accelerated, and combined with his pre-exiting disease or infirmity to produce his disability.
The WCJ awarded indemnity (temporary total disability)[1] benefits retroactive to the date of Graphic’s termination of benefits, all reasonable and necessary medical treatment, including payment for knee replacement surgery, and penalties of $2,000 for failure to pay for the surgery, $2,000 for failure to pay indemnity benefits, and $5,000 attorney fees. This appeal by Graphic ensued.

110Discussion

Graphic’s assignments of error assert that the severe degenerative arthritis in Henderson’s knee was a preexisting condition that unquestionably required total knee replacement surgery before his work-related accident of August 6, 2010. It urges that the symptoms of injury to Henderson’s knee were continuously present and exhibited before the accident, *605 causing him to make modifications to his work for the manner in which he operated the heavy equipment. Graphic argues that the jurisprudence “does not make a requirement that the preexisting symptoms had to be ‘disabling’ prior to the work accident,” and therefore Henderson’s symptoms before August 2010 show that the injury is not work-related and compen-sable.
A claimant who seeks workers’ compensation benefits on the basis that he is temporarily totally disabled must prove by clear and convincing evidence, without taking pain into consideration, that he is unable to engage in any employment or self-employment. La. R.S. 23:1221; Bolton v. Grant Parish School Bd., 98-1430 (La.3/2/99), 730 So.2d 882; Bailey v. Smel-ser Oil & Gas, Inc., 620 So.2d 277 (La. 1993). A workers’ compensation claimant has the burden of proving, by a preponderance of the evidence, that the disability suffered is related to an on-the-job injury. Scott v. Super One Foods, 45,636 (La. App.2d Cir.9/29/10), 48 So.3d 1133; Modi-cue v. Graphic Packaging, 44,049 (La. App.2d Cir.2/25/09), 4 So.3d 968; Taylor v. Columbian Chemicals, 32,411 (La.App.2d Cir.10/27/99), 744 So.2d 704.
| nA preexisting medical condition will not bar an employee from recovery if the employee establishes that the work-related accident aggravated, accelerated or combined with the condition to cause the disability for which compensation is claimed. Peveto v. WHO Contractors, 93-1402 (La.1/14/94), 630 So.2d 689; Silver-man v. Weatherford Int’l, Inc., 46,402 (La. App.2d Cir.10/19/11), 83 So.3d 11, unit denied, 12-0076 (La.3/23/12), 85 So.3d 89; Dombrowski v. Patterson-UTI Drilling Co., 46,249 (La.App.2d Cir.4/13/11), 63 So.3d 308; Koenig v. Christus Schumpert Health Sys., 44,244 (La.App.2d Cir.5/13/09), 12 So.3d 1037; Hatfield v. Amethyst Const., Inc., 43,588 (La.App.2d Cir.12/3/08), 999 So.2d 133, writ denied, 08-2996 (La.2/13/09), 999 So.2d 1150. The preexisting condition is presumed to have been aggravated by the accident if the employee proves (1) the disabling symptoms did not exist before the accident, (2) commencing with the accident, the disabling symptoms appeared and manifested themselves thereafter, and (3) either medical or circumstantial evidence indicates a reasonable possibility of causal connection between the accident and the activation of the disabling condition. Peveto, supra; Silverman, supra; Dombrowski, supra; Koenig, supra. Once the employee has established the presumption of causation, the opposing party bears the burden of producing evidence and persuading the trier of fact that it is more probable than not that the work injury did not accelerate, aggravate or combine with the preexisting disease or infirmity to produce his disability. Peveto, supra.
| ^Factual findings in workers’ compensation cases are subject to the manifest error or clearly wrong standard of appellate review. Banks v. Indus. Roofing & Sheet Metal Works, Inc., 96-2840 (La.7/1/97), 696 So.2d 551; Dombrowski, supra; Koenig, supra. To reverse a fact-finder’s determination under this standard of review, an appellate court must undertake a two-part inquiry: (1) the court must find from the record that a reasonable factual basis does not exist for the finding of the trier of fact; and (2) the court must further determine the record establishes the finding is clearly wrong. Stobart v. State through Dep’t ofTransp. & Dev., 617 So.2d 880 (La.1993); Dombrowski, supra; Koenig, supra.
Ultimately, the issue to be resolved by the reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder’s conclusion was a *606 reasonable one. Id. If the factual findings are reasonable in light of the record reviewed in its entirety, a reviewing court may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Id.
The opinion of the treating physician should be accorded greater weight than that of a physician who sees the patient only once or twice. Silverman, supra; Fuentes v. Cellxion, Inc., 44,914 (La.App.2d Cir.12/16/09), 27 So.Sd 1045. However, the treating physician’s testimony is not irrebuttable, and the trier of fact is required to weigh the testimony of all medical witnesses. Id. The opinion of the IME physician is prima facie evidence of the claimant’s condition. La. R.S. 23:1128.
11sThis court was presented with somewhat similar circumstances surrounding the employee’s injury in Koenig, supra. In that case, the employee was already scheduled for surgery for a tear in the rotator cuff of her shoulder when injured on the job. While she was extending her arm in a maneuver with a patient, the tear was further injured. After the work-related injury, her doctor refused to let her continue to work. Following the jurisprudence for a preexisting medical condition and the aggravation of the condition, this court found that the awards of disability benefits and the cost of the shoulder operation were not manifestly erroneous conclusions by the finder of fact.
While Koenig presented a difficult case, demonstrating the employment risks of work activity involving preexisting weakened conditions of employees, the jurisprudential test was properly followed and the manifest error standard allowed for the factual conclusion. Contrary to Graphic’s argument, a key change of circumstance is the employee’s ability to work before the accident and the loss of that ability after aggravation of the preexisting condition. Moreover, unlike the employee in Koenig, Henderson had never elected to have knee surgery. The doctors’ testimony was that Henderson’s choice in forgoing surgery did not mean that his ability to continue working would end at any definite future date. Also, Henderson’s activity that resulted in his accident was an unusual event or happenstance, involving no excessive exertion of his knee.
Thus, just as in Koenig, we hold that there was testimony from the doctors supporting the view that at least additional tearing of the meniscus 114occurred in the accident, causing Henderson’s symptoms in his knee to worsen. That worsening unquestionably caused his inability to work, which was not the case before the accident.
Regarding Graphic’s arguments against the award of penalties and attorney’s fees, La. R.S. 23:1201(1) provides as follows:
Any employer or insurer who at any time discontinues payment of claims due and arising under this Chapter, when such discontinuance is found to be arbitrary, capricious, or without probable cause, shall be subject to the payment of a penalty not to exceed eight thousand dollars and a reasonable attorney fee for the prosecution and collection of such claims. The provisions as set forth in R.S. 23:1141 limiting the amount of attorney fees shall not apply to cases where the employer or insurer is found liable for attorney fees under this Section. The provisions as set forth in R.S. 22:1892(0) shall be applicable to claims arising under this Chapter.
For purposes of imposition of attorney fees for discontinuance of workers’ compensation benefits, “arbitrary and capricious behavior” consists of willful and *607 unreasonable action, without consideration and regard for the facts and circumstances presented, or of seemingly unfounded motivation. Williams v. Rush Masonry, Inc., 98-2271 (La.6/29/99), 737 So.2d 41; Silver-man, supra; Crochet v. Barbera Chevy-Chrysler Co., Inc., 04-1390 (La.App.lst Cir.6/29/05), 917 So.2d 49. Whether a refusal to pay is arbitrary, capricious, or without probable cause depends primarily on the facts known to the employer or insurer at the time of its action. Williams, supra. The crucial inquiry is whether the employer had articulable and objective reasons for denying or discontinuing the benefits at the time it took that action. Id.
Based upon our above review of the WCJ’s determination of the aggravation of Henderson’s knee condition, the WCJ’s awards of the $2,0001 ispenalty for nonpayment of wage benefits and the $5,000 award in attorney fees are affirmed. Henderson’s inability to work after the accident, which has never been contested, makes Graphic’s discontinuation of wage benefits arbitrary and capricious.
Nevertheless, since Henderson admittedly received the payment from his healthcare insurer for the cost of total knee replacement surgery, we find that La. R.S. 23:1205(C)[2] makes the issue of the responsibility for medical costs and penalties a matter between the two insurers. Accordingly, the $2,000 penalty for Graphic’s failure to provide medical treatment is reversed.

Conclusion

For the foregoing reasons, we affirm the WCJ award of benefits to Henderson. We affirm the $2,000 penalty award for nonpayment of wage benefits and the attorney fee award of $5,000. We reverse the $2,000 penalty award for failure to provide medical treatment. Costs of this appeal are assessed to Graphic.
J^JUDGMENT AFFIRMED IN PART; REVERSED IN PART; RENDERED.

. At oral argument, it was conceded that the issue of Henderson's entitlement to supplemental earnings benefits had not been litigated.

. C.(l) In the event that the workers' compensation payor has denied that the employee’s injury is compensable under this Chapter, then any health insurer which contracts to provide health care benefits for an employee shall be responsible for the payment of all medical benefits pursuant to the terms of the health insurer’s policy. Any health insurer which contracts to provide health care benefits for an employee who violates the provisions of this Subsection shall be liable to the employee or health care provider for reasonable attorney fees and costs related to the dispute and to the employee for any health benefits payable.
(2) The payment of medical expenses shall be recoverable pursuant to and in accordance with Subsection B of this Section. However, if it is determined that the worker’s compensation payor was responsible for payment of medical benefits that have been paid by the health insurer, the obligation of the worker’s compensation payor for such benefits shall be to reimburse the health insurer one hundred percent of the benefits it paid. If it is determined that the worker's compensation payor was responsible for payment of benefits and its denial of responsibility is determined to be arbitrary and capricious, then the health insurer shall also be entitled to recover legal interest on any benefits it paid, calculated from the date such benefits were due.
(3) Any claim filed against the worker’s compensation carrier by the health insurer or health providers in accordance with this provision shall not be subject to timely filing requirements, nor does prescription run until such time as the workers' compensation claim reaches a resolution by final judgment or settlement.